**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CRYSTAL CRAWFORD | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ALLSTATE INSURANCE | : | NO.  07-3758 |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                August 31, 2009

Plaintiff Crystal Crawford's Complaint alleges that Defendant Allstate Insurance

Company's  ("Allstate") conduct in settling her insurance claim constitutes bad faith under

Pennsylvania law.[1]  She makes this claim even though Allstate awarded her both the policy's full

$100,000 uninsured motorist ("UM") policy limit, as well as its entire $5,000 wage loss policy

limit.  Allstate subsequently filed a Motion for Summary Judgment.  Crawford responded to

Allstate's Motion for Summary Judgment, and Allstate replied to her Response.  For the reasons

discussed below, this Court grants Allstate's Motion for Summary Judgment.

**I.  FACTUAL BACKGROUND**

      **A.**      **The Complaint**

Crawford's suit arises from her efforts to resolve an insurance claim with her

insurer, Allstate.  On September 8, 2005, Crawford was injured when the car she was driving was

rear-ended.  (Compl. ¶¶ 4-6.)  The driver of the other vehicle was not insured.  As a result,

---

1.  42. Pa. Cons. Stat. § 8371.

Crawford sought to recover the entire $100,000 UM and $5,000 wage loss limits contained in her

Allstate policy.  When Allstate indicated that it was unable to determine if it was a "policy

limits" case, Crawford demanded arbitration.  (Id. at ¶ 7.)  Allstate made Crawford a $75,000

settlement offer which she refused.  (Id. at ¶¶ 12-13.)  Eventually, Allstate offered Crawford both

the $100,000 UM policy limit and the $5,000 wage loss policy limit.  She accepted both offers.

(Id. at ¶ 17.)

     In raising this Complaint, Crawford alleges nineteen particular acts that evidence

Allstate's bad faith.  (Id. at ¶ 19.)  Given these allegations, Crawford seeks to recover for

damages including:

> a.) interest in the amount of the claim from the date
> the claim was submitted by the plaintiff, equal to
> the prime rate of interest plus 3 percent;
> b.) compensatory damages;
> c.) courts costs, arbitration costs, witness costs, and
> attorney's fees incurred in the arbitration of the
> claim;
> d.) court costs and attorney's fees incurred in this
> litigation; and
> e.) punitive damages.

(Id. at ¶ 20.)

### B.    Synopsis of Key Factual Background[2]

     The factual background for this suit is extensive.  While there are many details,

the key facts and dates are quite straightforward.  By providing a synopsis of key dates, at the

outset of this Memorandum, this Court endeavors to cut through the morass of claims, counter-

claims, and assertions:

---

2.  This section is drawn primarily from exhibits provided by the parties.

| | | |
|---|---|---|
| • | September 8, 2005: | Crawford was injured when an uninsured motorist rear-ended her car.  (Compl. ¶ 4.) |
| • | September 9, 2005: | Crawford notified Allstate of the accident.  (Allstate's Mot. Summ. J. 3.) |
| • | September 15, 2005: | Thaddeus Bartkowski II notified Allstate that he was Crawford's legal counsel.  (Id., Ex. 2 Allstate Claim Diary 4.) |
| • | September 13, 2006: | Allstate first obtained medical records from Crawford.  (Id., Ex. 18, Bartkowski Sept. 11, 2006 letter.) |
| • | March 6, 2007: | Donaghue wrote Bartkowski stating "that I have been authorized to offer the claimant $75,000 to settle the above captioned matter."  (Id., Ex. 49, Donaghue Mar. 6, 2007 letter.)  Crawford refused. |
| • | July 11, 2007: | Allstate received Crawford's medical records from Bryn Mawr Rehab.  (Id., Allstate Claim Diary 36.) |
| • | July 17, 2007: | Donaghue wrote Bartkowski stating "[p]lease be advised that Allstate Insurance Company hereby tenders its $100,000 policy limits in the above captioned matter. Accordingly, I enclose a Release to be executed by the claimant."  (Id., Ex. 68, Donaghue July 17, 2007, letter.) |
| • | July  26, 2007: | Bartkowski faxed a signed, revised release to Donaghue. (Id., Ex. 69, Signed and Revised Release.) |
| • | August 20, 2007: | Donaghue forwarded the settlement check to Bartkowski. (Id., Ex. 76, Donaghue Aug. 20, 2007 letter.) |
| • | September 10, 2007: | Bartkowski provided Allstate with the required wage loss documentation.  (Id., Ex. 2, Claims Diary ("Claims Diary") 40-41.) |
| • | September 10, 2007: | Crawford filed suit against Allstate. |
| • | September 12, 2007: | A wage loss check was issued to Crawford.  (Id.) |

## II.  LEGAL STANDARD

### A.     Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For there to be

3

a "genuine" issue, a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  (Id.)

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. County of Allegheny, PA, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993.)  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587  (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  (Id. at 325.)  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec., 475 U.S. at 586.  "There must be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted.  Arbruster v. Unisys Corp., 32

4

F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Center, 190 F.3d 231 (3d Cir. 1999).

## III.   ANALYSIS

Crawford's Complaint raises a variety of general and specific allegations which she believes support a bad-faith claim.  This Court groups Crawford's claims together, based on their typicality, addressing them in turn: (1) Allstate's delay in processing Crawford's claim; (2) Allstate's unreasonable settlement offer; (3) Donaghue's misrepresentation of the contents of Crawford's medical records; (4) Allstate's improper release and subsequent delay in issuing the $100,000 UM settlement check; (5) Allstate's use of an unfair doctor and an unfair arbitrator.[3]

Where an insurer refuses to settle a claim that could have been resolved within the policy limits without "a bona fide belief . . . that it has a good possibility of winning," it breaches its duty to act in good faith.  Cowden v. Aetna Cas. and Sur. Co., 389 Pa. 459, 134 A.2d 223, 229 (1957).  Pennsylvania does not have a common-law remedy for insurance bad faith.  Rather in 1990, the legislature enacted 42 Pa. C.S. § 8371 which provides a statutory remedy for bad faith. See 42 PA. CONS. STAT. § 8371 (1990).

To sustain a section 8371 claim, a Plaintiff must show that the: (1) the insurer did not have a reasonable basis for denying benefits under the applicable insurance policy; and (2) the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim.

---

3.  Several of Crawford's claims address Allstate's allegedly dilatory actions which compelled her to institute litigation.  (See Complaint ¶ 19(m), (q), & (r) ((m) compelling the plaintiff to institute litigation to recover amounts due under the insurance policy; (q) requiring the plaintiff to file a motion to obtain medical records and the history of the number of claimants referred to Dr. Bonner; and (r) requiring plaintiff to file motion to obtain the check).)   Some of these issues are addressed in other, related sections, but this Court does not look at the more general claim that Allstate compelled Crawford to both institute litigation and file numerous discovery motions as this Court determines that such claims are baseless.

Terletsky v. Prudential Prop., 649 A.2d 680, 688 (Pa. Super. Ct. 1994), appeal denied, 540 Pa.

641 (1995).  "Bad faith by the insurer is any frivolous or unfounded refusal to pay proceeds of

the policy, the refusal need not be fraudulent, but bad faith imports a dishonest purpose and

means a breach of a known duty through some motive of self-interest or ill will."[4]  Adamski v.

Allstate Ins. Co., 738 A.2d 1033, 1035 (Pa. Super. Ct. 1999) (quotations omitted.)

"[B]ad faith must be proven by clear and convincing evidence and not merely

insinuated."  Id., see; Greene v. United Servs. Auto. Ass'n, 936 A.2d 1178 (Pa. Super. Ct. 2007)

(stating that the court was not convinced, by clear and convincing evidence, that the insurer acted

in bad faith, or with dishonest purpose, ill-will, or self interest),  appeal denied, 2008 WL

2894845 (Pa. 2008).   Mere negligence or bad judgment by an insurer in refusing to pay a claim

is not "bad faith."  O'Donnell ex rel. Mitro v. Allstate Ins. Co., 734 A.2d 901 (Pa. Super. Ct.

1999).

Bad faith under section 8371 is not restricted to the denial of an insurance claim.

See Ania v. Allstate Ins. Co., 161 F. Supp. 2d 424, 430 n.7 (E.D. Pa. 2001) (holding that section

---

4.   The Third Circuit in Klinger v. State Farm Auto. Ins. Co., 115 F3d 230, 233 (3d Cir. 1997) reviewed a bad faith
claim brought under section 8371.  The Third Circuit noted that the district court's analysis correctly relied upon
Terletsky v. Prudential Prop., 649 A.2d 680, 688 (Pa. Super. Ct. 1994).  While approving Terletsky's standard for
determining insurance bad faith, the Third Circuit expressed reservation about Terletsky's citation to the Black's
Law Dictionary definition of insurance bad faith even though such a reference was only dictum.  The Dictionary
defined bad faith as: "any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such
refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a
dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), **through some motive of
self-interest or ill will**; mere negligence or bad judgment is not bad faith."  Terletsky, 649 A. 2d at 688 (citing
BLACK'S LAW DICTIONARY 139 (6th ed. 1990) (internal citations omitted) (emphasis added.))
          Even if they do not directly cite Terletsky or Black's Law Dictionary, numerous courts in the
Commonwealth have noted that insurance bad faith can include actions shaped by "some motive of self-interest or ill
will."  See Riethmiller v. Bedford County Grange Mut. Ins. Co., Civ. A. No. 1999-1014, 2001 WL 34779791, at
*196 (Pa. Ct. Com. Pl. May 30, 2001) (quoting Black's Law Dictionary's definition of bad faith and citing Romano
v. Nationwide Mut. Fire Ins. Co. for the same proposition); O'Donnell v. Allstate Ins. Co., 734 A.2d 901, 905 (Pa.
Super. Ct. 1999).

8371 "applies equally to an unreasonable delay in payment"); Terletsky, 649 A.2d 680 (finding

bad faith based upon a frivolous or unfounded refusal to pay the proceeds of a policy);

O'Donnell, 734 A.2d at 906 ("An action for bad faith may also extend to the insurer's

investigative practices"); Romano v. Nationwide Mut. Fire Ins. Co., 646 A.2d 1228, 1232 (Pa.

Super. Ct. 1994) (affirming a finding of bad faith when insurer refused to settle a claim that could

have been settled within the policy limits).  Courts, however, have refused to find bad faith when

an insurer makes a low but reasonable offer.  Terletsky, 649 A.2d at 688.  Similarly, bad faith has

not been found where the insurer acted to "aggressively investigate and protect its interest."

O'Donnell, 734 A.2d at 910.

    To survive summary judgment Crawford must raise genuine issues of material

fact showing that Allstate possessed "clear and convincing evidence" that it had no "reasonable

basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded

said lack of reasonable basis for denying benefits."  Id.

### 1.    Allstate's Delay in Processing Crawford's Claim[5]

    Crawford asserts that Allstate engaged in unreasonable delays in settling her

insurance claim.  At first blush, this claim seems reasonable as Crawford was injured on

September 8, 2005, and it was not until August 2007 that Allstate settled her UM claim.  That

there is no bad faith is apparent upon examination of the factual record.  This Court examines

this claim by looking at two distinct time periods: (1) Allstate's actions immediately following

---

5.  The Court groups Plaintiff's assertions raised in ¶ 7 with the following subsections from ¶ 19 of Plaintiff's Complaint: (g) providing letters stating that the claim was under investigation and/or in arbitration without reference to the facts of the status of the claim; (i) refusal to affirm or deny that the other operator was uninsured; and (o) delaying claim payment for such a period of time to put financial pressure on the plaintiff to accept a lower amount than that plaintiff is entitled under the policy.  (Compl. ¶¶ 7 & 19(g), (i), & (o).)

the September 2005 accident; and (2) Allstate's actions after it first obtained medical records from Crawford.

> ### a.   Allstate's Actions Immediately Following the September 2005 Accident

> #### i.   Allstate Promptly Took Action Following the September 2005 Accident

Crawford informed Allstate of her accident on September 9, 2005.  (Allstate's Mot. Summ. J., Ex. 2, Allstate Claim Diary 1.)  Four days later, Allstate wrote Crawford explaining her benefits, providing her with the necessary paperwork, and asking that she take a variety of steps to expedite her claim.  (<u>Id.</u>, Ex. 3, Allstate Sept. 13, 2005 letter.)  On September 15, 2005, Bartkowski notified Allstate that he was legal counsel for Crawford.  (<u>Id.</u>, Allstate Claim Diary 4.)  That same day, Allstate arranged to have Crawford's vehicle inspected, and an Allstate representative wrote in Allstate's Claims Diary that, "I also advised her (Crawford) that I will give her a call when her check is mailed out."  (<u>Id.</u> at 5.)  On September 23, 2005, an Allstate UM claims processor sent Mr. Bartkowski a letter detailing Allstate's policy requirements for an UM claim.  (<u>Id.</u>, Ex. 5, Allstate Sept. 23, 2005 letter.)  The letter contained a medical authorization form asking that Crawford return the form so Allstate could "secure medical reports and other information needed to properly evaluate this claim." (<u>Id.</u>)

Not having received any forms from Crawford, Allstate wrote Bartkowski requesting that Crawford: (1) ask her doctor to complete and return the enclosed "Attending Physician's Report;" (2) ask her employer to complete and return the enclosed "Wage & Salary Verification" form; and (3) complete and return the enclosed "Application for Benefits" form.

(Id., Ex. 7, Allstate Nov. 4, 2005 letter.)[6]  Ten days later, Allstate again sent these forms to

Bartkowski.  (Id., Ex. 12, Allstate Nov. 14, 2005 letter.)

Even though Crawford did not submit any forms to Allstate, it "processed all bills

submitted to date."  (Id., Ex. 14, Allstate Jan. 19, 2006 letter; see also Ex. 15, Allstate Feb. 23,

2006 letter.)  Allstate in February 2006 contacted Crawford about any "additional bills" that may

be outstanding.  (Id.)

### ii.   Crawford Waits One Year Before Providing Medical Records to Allstate

Crawford's Complaint and the record make clear that a year passed before

Crawford provided Allstate with any medical records.  She first provided medical records to

Allstate in September 2006.[7]  Likewise, almost two years passed before Crawford returned her

wage loss verification forms to Allstate.  (Claims Diary 39.)  Crawford's delays, coupled with the

fact that Allstate did not have all the records it sought until July 2007, undermines her assertion

that Allstate delayed payment "to put financial pressure on the plaintiff to accept a lower amount

than that plaintiff is entitled under the policy."  (Compl. ¶ 19(o).)

---

6.  Bartkowski makes several assertions regarding his November 4, 2005, phone call with Allstate.  First, he claims that Allstate representative Tressa Chretien spoke with him on the phone but she "hung up for the reason that counsel refused to be talked over."  (Crawford's Resp. Mot. Summ. J. 3.)  Second, he claims that given his delay in receiving Chretien's November 4, 2005, letter, she "presumably post-dated the November 4, 2008 (sic) letter."  (Id.)
        Chretien does not deny hanging up on counsel.  In fact, she recorded the fact that she hung up on him due to his "screaming and hollering."  (Claims Diary 11.)  Further undermining any notion of bad faith is the fact that Chretien sent forms to Bartkowski that same day.  (Id.)  That said, even if it were true, it would not constitute bad faith as Allstate had previously sent these same forms to Crawford and also mailed them to Bartkowski on November 14, 2005. (Id., Ex. 12, Allstate Nov. 14, 2005 letter.)  Bartkowski's claim that Chretien back-dated her November 4, 2005 letter is nothing more than speculation.  Assuming, for purposes of summary judgment, that Bartkowski is correct and Chretien hung up on him unprovoked, such an action does not constitute bad faith.

7.  Crawford, in her Complaint admits that she did not timely provide Allstate with her medical records stating that, "[a]lthough the plaintiff through her counsel provided medical proof of the aforementioned injuries, and although the plaintiff through her counsel provided medical proof of the aforementioned injuries, and although the plaintiff through her counsel demanded the policy limits, **each on September 12, 2006**, the defendant offered no money to the plaintiff."  (Compl. ¶ 7) (emphasis added.)

9

Even though she neither returned any forms nor provided her medical records, Allstate continued to pay for Crawford's medical coverage.  Thus, in the year following Crawford's accident, Allstate: (1) contacted Crawford abut her claim; (2) repeatedly provided both her and her counsel with the forms necessary to proceed with her claim; (3) timely inspected her automobile; and (4) processed and paid her medical claims.  Notwithstanding Allstate's efforts, Plaintiff did not return her medical authorization form until November 2006—over a year after the accident.  (Id., Ex. 28, Crawford Medical Authorization.)  The record is clear that any "financial pressure" placed upon Crawford was due, in a large part, by her failure to timely submit the required forms even though Allstate repeatedly asked for them.

### b.  Allstate's Action After Crawford Provides Her Medical Records to Allstate

On September 12, 2006, Bartkowski finally provided some medical records to Allstate. These records were far from exhaustive.  During a September 18, 2006, phone call Bartkowski told Allstate claims adjuster, Welsh, that "he is in the process of getting" Crawford's medical records and that Crawford would pursue arbitration.[8]  (Claims Diary 18.)  Four days later, Allstate secured outside counsel.  (Id.)  On October 4, 2006, Hugh Donaghue wrote

---

8.  Writing in Allstate's Claims Diary, Welsh indicated that Bartkowski told her that "he feels this case is worth P/L [policy limit] plus more with info we have." (Claims Diary 19.)  The notes indicate that she told Bartkowski that after reviewing the available medical records she "could not say to him if this is P/L case," and as a result Bartkowski stated that he would pursue arbitration.  (Id.)  Bartkowski disagrees with Welsh's characterization of their phone call asserting that "Welsh stated that she 'would never offer the policy limits.'" (Crawford's Resp. Mot. Summ. J. 8.)

Bartkowski notes that this raises a "material issue of fact for the reason that Allstate alleges that Welsh said 'based on the information she had at that point, she could not say this was a policy limits case.'" (Id.) Assuming, for purposes of summary judgment analysis, that Bartkowski is correct and that Welsh stated that she "would never offer the policy limits," this disagreement of a minor factual matter does not rise the level of a genuine issue of material fact sufficient to defeat summary judgment.  Most importantly, the record indicates that even if Welsh stated that she "would never offer the policy limit," her actions were completely contrary to that alleged statement.  Months later, having obtained the entire medical record, Welsh suggested that Allstate offer Crawford the policy limit.  The September 18, 2006, phone call between Bartkowski and Crawford in no way evidences bad faith.

Crawford's counsel stating that he had been retained by Allstate for this matter and indicating his intention to take Crawford's sworn statement.  (Id., Ex. 25, Donaghue Oct. 4, 2006 letter.)

On November 7, 2006, Donaghue wrote Bartkowski confirming that he had scheduled Crawford's sworn statement for December 12, 2006.  (Id., Ex. 26, Donaghue Nov. 7, 2006 Statement letter.)  That day, in a separate letter, Donaghue sent Crawford's medical authorization forms to Bartkowski.  (Id., Ex. 27, Donaghue Nov. 7, 2006 Authorization letter.)

Crawford, on November 9, 2006, executed the medical authorizations forms and included a list of treating physicians.  (Id., Ex. 28, Crawford Medical Authorization.)  Donaghue, on December 12, 2006, took Crawford's statement under oath.  (Id., Ex. 1, Crawford's Statement Under Oath ("Crawford Statement").)  It was at this time that Donaghue claims he first learned of Crawford's August 2000 automobile accident that resulted in her hospitalization.  (Id. at 42:7-24, 43:4-8.)  On December 15, 2006, Donaghue wrote three letters: one to MLR and two to Crawford's attorney.  The letter to MLR asked that it subpoena all of Crawford's medical records pertaining to her August 2000 accident.  (Id., Ex. 30, Donaghue Dec. 15, 2006 MLR letter.)  The letters to Crawford's counsel: (1) sought to schedule Crawford's independent medical examinations ("IME"); and (2) provided an employment information release form.  (Id., Ex. 31, Donaghue Dec. 15, 2006 IME letter; Ex. 33, Donaghue Dec. 15, 2006 Release letter.)

On December 18, 2006, Donaghue wrote to Doctors Bonner and Zimmerman, both of whom were scheduled to conduct Crawford's January 9, 2007 IMEs. (Id., Ex. 35, Bartkowski Dec. 19, 2006 IME letter.)  Donaghue included the medical records he possessed noting that he had "subpoenaed more complete records and will forward them to you upon receipt." (Id.)  Donaghue wrote Bartkowski on December 21, 2006, to confirm the scheduled,

January 9 IMEs and to request that Crawford return her employment authorization form.  (Id., Ex. 31, Bartkowski Dec. 15, 2006 IME letter.)  On January 2, 2007, Donaghue sent recently received medical records to Doctors Bonner and Zimmerman noting that he would "forward copies of additional subpoenaed records upon receipt."  (Id., Ex. 37, Donaghue Jan. 2, 2007 letter.)  Donaghue, on the day of the scheduled IMEs, sent newly received medical records to Doctors Bonner and Zimmerman.  (Id., Ex. 38, Donaghue Jan. 9, 2007 letter.)  Doctor Bonner examined Crawford's neck and back while Doctor Zimmerman examined her left knee.  (Id., Ex. 39, Dr. Bonner Jan. 9, 2007 IME Report ("Bonner Report") & Ex. 40, Dr. Zimmerman Jan. 19, 2007 IME Report ("Zimmerman Report").)

Donaghue received the Bonner Report on January 19, 2007, and forwarded it to Crawford's counsel on February 5, 2007.  (Id., Ex. 39, Bonner Report & Ex. 41, Donaghue Feb. 5, 2007 Bonner Report letter.)  Donaghue received the Zimmerman Report on February 4, 2007.  (Id.,  Ex. 41, Donaghue Feb. 5, 2007 Bonner Report letter.)  The next day, Donaghue wrote to Doctor Zimmerman asking that he examine "films from Riddle Memorial Hospital referable to Crystal Crawford."  (Id., Ex. 42, Donaghue Feb. 5, 2007 Zimmerman letter.)  On February 21, 2007, Donaghue forwarded the Zimmerman Report to Crawford's attorney.  (Id., Ex. 43, Donaghue Feb. 19, 2007 letter.)

Based on the information obtained to date, Allstate's claim adjuster evaluated Plaintiff's claim and developed a negotiation plan.  (Id., Ex. 48, Allstate Negotiation Plan.)  Afterward, Donaghue wrote Bartkowski stating, "that I have been authorized to offer the claimant $75,000 to settle the above captioned matter.  If she is interested, we can set up a

structured settlement."  (Id., Ex. 49, Donaghue Mar. 6, 2007 letter.)[9]  Crawford refused the offer.[10]

Donaghue's secretary wrote Bartkowski stating that her office had not obtained records from Bryn Mawr Rehab.  (Id., Ex. 58, Donaghue July 2, 2007 letter.)  On July 11, 2007, Allstate received Crawford's Bryn Mawr Rehab records.  (Id., Allstate Claim Diary 36.)  These records addressed her lengthy hospitalization following the August 2000 accident.  Welsh reviewed these records finding that "there was no mention in those records at all that she injured her knee."  (Id., Deposition of Tricia Welsh, 61:23-25, June 26, 2008.)  The records showed that Crawford's  knee was not injured in the August 2000 accident.  As a result, Welsh stated that she "re-evaluated the file at that point based on the medical records we received . . ..  And I requested the policy limits of $100,000."  (Id. at 61:17-19.)  Evaluation Comment notes from July 17, 2007 indicate that, "we now have more complete records from the 8/18/00 MVA [motor vehicle accident] and there is no mention at all of the knee.  With the def [defendant's] IME essentially giving 02[11] a permanent inj [injury], I agree that we need to be ready to offer the $100,000."  (Id., Ex. 48, Evaluation Notes 4.)  That same day, Donaghue wrote Bartkowski stating "[p]lease be

---

9. On March 7, 2007, Allstate tendered a $75,000 settlement offer.  That same day (at 11:42 p.m.), Bartkowski faxed a letter seeking to memorialize an early February phone call between himself and Donaghue during which Donaghue "called to insist" that Crawford must withdraw the policy limit demand before Allstate would make any settlement offer.  (Id., Ex. 50, Bartkowski Mar. 7, 2007 letter.)  Bartkowski's letter appears to be last minute effort to memorialize an almost one month-old phone call during which he claims that Donaghue stated that Allstate would never tender an offer to Crawford unless she refused to settle for less than the policy limits.
    Assuming that Bartkowski's description of the phone call is true, this evidence is not sufficient to support a claim of bad faith as Allstate did precisely what Bartkowski claims that they said they would not do: make an offer even though Crawford did not reduce her demand.  Accordingly, this purported statement by Donaghue does not constitute evidence of bad faith.

10.  Bartkowski's March 7, 2007 letter also asserts that Donaghue misrepresented medical records in his possession and then subsequently declined to provide them to him.  These claims will be addressed subsequently.

11.  In Allstate's notes, 02 appears to be shorthand for Crystal Crawford.

13

advised that Allstate Insurance Company hereby tenders its $100,000 policy limits in the above captioned matter.  Accordingly, I enclose a Release to be executed by the claimant."  (Id., Ex. 68, Donaghue July 17, 2007, letter.)

The record provides no indication that Allstate, after obtaining Plaintiff's medical records, delayed in settling with Crawford as insurance companies are permitted to conduct reasonable, good-faith examination of a claimant's medical record.  See Segall v Liberty Mut. Ins. Co., Civ. A. No. 99-6400, 2000 WL 1694026, at *3 (E.D. Pa. Nov. 9, 2000) (noting that continued investigation was "continued investigation was appropriate").  These are precisely the steps taken by Allstate.  Without having all of Crawford's medical records Allstate's counsel took her sworn statement, and arranged for her to undergo two IMEs.

Allstate's persistence in obtaining Crawford's records worked to her benefit since after receiving the entire record of Crawford's hospitalization at Bryn Mawr Rehab, Allstate promptly revised its position and offered her the entire UM policy amount.  (Allstate's Mot. Summ. J.; Ex. 68, Donaghue July 17, 2007, letter.)  Thus, within six days of receiving, what it deemed to be important, conclusive medical records, Allstate offered Crawford the entire $100,000 UM policy limit.  Far from bad faith, Allstate had a reasonable, good-faith basis for delaying settlement — for over a year it received no medical records from Crawford.  After receiving some of Crawford's medical records, Allstate promptly proceeded with its evaluation of Crawford and her claim, settling within a week of receiving the final records sought.

**2.     Allstate's Unreasonable Settlement Offer**[12]

---

12.   The basis for this claim is contained in ¶ 12 ("the defendant offered 75% of the policy limits but not the policy limits") as well as the following subsections of ¶ 19: (b) refusing to pay the claim without conducting a reasonable

(continued...)

14

Plaintiff asserts that Allstate's settlement offer was unreasonable.  This claim effectively has two prongs: (1) Allstate's initial $75,000 settlement offer was unreasonable; and (2) Allstate did not reasonably investigate Crawford's claim.  This Court will address each claim in turn.

### a.      Allstate's $75,000 Offer Was Not Unreasonable

It is clear from her counsel's earliest conversations with Allstate that Crawford viewed her claim as intrinsically worth the policy limit believing that this should have been apparent to Allstate from the moment some medical records were finally provided them.  (See Compl. ¶ 7.)  This logic, however, was soundly rejected in Condio v. Erie Ins. Exch., 899 A.2d 1136 (Pa. Super. Ct. 2006), where the court noted that an insurer was not obligated to pay an insurance claim "on demand, no questions asked."  Id. at 1145.[13]

Insurers are permitted to protect their interests – which include making sure that the insured's claim is justified – but must have a reasonable basis for their actions.  Condio, 899 at 1145.  Initially, Allstate offered Crawford $75,000 to settle her claim.  She refused this offer – a decision not only within her rights but ultimately within her financial best interest – as Allstate eventually paid her $100,000.  For Crawford to prevail on her bad faith claim, she must show by clear and convincing evidence that Allstate had no reasonable basis for its initial settlement

---

12.  (...continued)
investigation based upon all available information; (c) not acting in good faith to pay policy limits for which the defendant's liability under the policy was conspicuously clear; and (m) compelling the plaintiff to institute litigation to recover amounts due under the insurance policy.  (Compl. ¶¶ 12 & 19(b),(c), & (m).)

13.  "To recover damages for an insurer's refusal to pay on a policy, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim in order to recover for bad faith conduct."  14 Summ. Pa. Jur. 2d Insurance § 22:11 (2009).

offer.[14]  Crawford is unable to make such a showing as a low, but reasonable offer, is not

evidence of bad faith.  See O'Donnell, 734 A.2d at 910 (noting that in the absence of evidence of

a dishonest purpose or ill-will, it is not bad faith to take a stand with a reasonable basis or to

"aggressively investigate and protect its interests.")  Crawford provides no evidence suggesting

that Allstate's initial offer was unreasonable.

   The medical records show that Crawford's medical condition was complex,

justifying careful examination.  An MRI of her cervical spine revealed two herniations, a spinal

bulge, and several pre-existing spinal conditions: osteophytes and spondylosis.  (Allstate's Mot.

Summ. J., Ex. 11, Crawford's Medical Records ALL628-29.)  A subsequent MRI of her lumbar

spine revealed a broad-based disc protrusion at L4-L5 and L5-S1, as well as some degeneration.

(Id. at ALL632.)

   From September 22, 2005, through February 23, 2006, Crawford made twenty-

one visits to the Sports Medicine Rehabilitation Center at Pennsylvania Hospital.  (Id. at

ALL602-ALL623.)  Despite lingering troubles, the arc of Crawford's recovery was clear: as she

returned to the gym (Id. at ALL604 (Oct. 18, 2005 therapy notes), and went on a weekend skiing

trip.  (Id. at ALL616 (Feb. 7, 2006 therapy notes.)

   Crawford's rehabilitation notes were part of the initial group of medical records

provided to Allstate in September 2006.  As this Court's brief synopsis indicates, these notes

provide a complex and somewhat contradictory glimpse of Plaintiff: suffering from continuing

---

14.  Crawford's claim that Allstate should have paid the policy limit because her injuries "are in excess of that" is unsupported by the record.  (Compl. ¶ 19(n).)  Just as Crawford has provided no basis for suggestion that a $75,000 offer is unreasonable, she not shown any basis for concluding either that the claim was patently worth $100,000 or that the injuries were in excess of $100,000.

pain while also making steady progress.  The rehabilitation notes are consistent with both IMEs, which note Crawford's progress, but opine that she will continue to suffer from pain.[15]

These records do not provide "clear and convincing" evidence that this case was worth more than $75,000.  Settlement at an amount higher than the initial settlement offer is not evidence of bad faith.  See Williams v. Hartford Cas. Inc. Co., 83 F. Supp. 2d 567, 576 (E.D. Pa. 2000) (awarding summary judgment for insurer even though arbitration award was $250,000 higher than the highest settlement offer), aff'd, 261 F.3d 495 (3d Cir. 2001)).   The relevant issue is not the disparity between Allstate's initial and final offer.  The issue remains whether Crawford has "clear and convincing evidence" that Allstate's initial offer was unreasonable and that it knew the offer was such.  Crawford has failed to sustain her burden.

### b.    Allstate Reasonably Investigated the Information

Contrary to Crawford's assertion, the record does not suggest that Allstate did not conduct "a reasonable investigation of all available information."  (Compl. ¶ 19(b).)  Allstate obtained most of Crawford's medical records well in advance of its July 2007 $100,000 settlement offer.  Any delay in settlement was based upon an effort to conduct a reasonable and thorough investigation.  It is not unreasonable, given the August 2000 accident, that Allstate did not make a second offer until it had obtained and reviewed the Bryn Mawr medical records.  Similarly, Allstate understood that Crawford was not deviating from her demand for the policy

---

15.  Doctor Bonner's report concluded that "[t]he patient continues with subjective complaints, but without objective findings on physical examination.  No further treatment would be considered reasonable or necessary in relation to the incident of 9/8/05."  (Bonner Report 2.)  Similarly, Doctor Bonner noted that "[h]er condition will cause her to have intermittent periods of pain in her knee and occasional swelling. Surgery is not recommended for this condition."  (Zimmerman Report 3.)

limit.  Allstate had no interest in negotiating against itself, and it sought to marshal the evidence before proceeding.

After the Crawford disputes Allstate's explanation that it delayed its offer because it did not have the Bryn Mawr records.  (Crawford's Resp. Mot. Summ. J. 9.)  In fact, as argued by Crawford, Allstate "had the Bryn Mawr records six months before it pretends that it received the Bryn Mawr records for the first time." (Id.)  Allstate rebuts this assertion noting that prior to July 2007, it only had "a three-page Discharge Summary from Bryn Mawr Rehab Hospital," and that its counsel "did not feel that he could get a complete picture of the injuries suffered by Plaintiff in the August 10, 2000 accident based solely upon the Discharge Summary."  (Allstate's Reply Br. 6 & Ex. 84, Affidavit of Hugh A. Donaghue ¶ 16) ("The Discharge Summary is not and does not purport to be a complete recitation of all of Ms. Crawford's complaints.  Rather it is a summary of her chief complaints and diagnoses.")  Donaghue noted that Crawford was unrestrained in the August 2000 accident (a head-on collision), and stated that he felt it "was possible, if not likely that Plaintiff suffered knee, neck or back pain" as a result of the accident. (Id. at ¶ 17.)  It was entirely reasonable for Allstate to rely upon the determinations and opinions of its counsel.

After obtaining the Bryn Mawr records, Allstate determined that Crawford did not injure her knee in the August 2000 accident, and as a result promptly offered her the entire policy amount.  Allstate's response suggests a reasonable, timely process, based on an examination of the entire record culminating in a policy limits offer.  (Compl. ¶ 19(c).)

18

### 3.     Misrepresenting the Contents of Crawford's Medical Records[16]

Crawford alleges that Allstate: (1) misrepresented the content of medical records in its possession; and (2) subsequently delayed providing these records to her.  The Court addresses these claims in turn.

### a.     Donaghue's Delay in Providing Medical Records to Crawford

As discussed previously, counsel for the parties spoke in early February 2007. During this phone call, Donaghue allegedly made two statements: (1) Allstate would not make a settlement offer unless Crawford sought less than the policy limit; and (2) he claimed to have medical records showing that Crawford suffered "<u>lumbar disc</u> damage from the auto accident of August, 2000."   (Allstate's Mot. Summ. J.; Ex. 46, Bartkowski Feb. 7, 2007 letter; Ex. 50, Bartkowski Mar. 7, 2007 letter) (emphasis in original).)

On February 7, 2007, Bartkowski wrote to Donaghue including a request for admissions and a request for production of documents.  (<u>Id.</u>, Ex. 46, Bartkowski Feb. 7, 2007 letter.)  Bartkowski asked that Donaghue reply within thirty days.  (<u>Id.</u>)  On February 14, 2007, Donaghue replied stating that:

> [i]n my years of practice, I have yet to be served with Request for Admissions and Request for Production of Documents in a UIM case.  Upon further reflection, it is my intention not to answer the same.  However, at any time you may review any and all medical records of the claimant in my possession.  Furthermore, I will provide you with

---

16.   The Court groups Plaintiff's assertions raised in ¶¶ 11, 14, and 15 with the following subsections from ¶ 19 of Plaintiff's Complaint into this category: (a) misrepresenting pertinent facts relating to the content of the medical records; (f) withholding the plaintiff's medical records while misrepresenting the content of those records; and (q) requiring the plaintiff to file a motion to obtain medical records and the history of the number of claimants referred to Dr. Bonner.  (Compl. ¶¶ 11, 14, 15, & 19(a), (f), & (q).)

copies of the same if you let me know you want
them.[17]

(Id., Ex. 47, Donaghue Feb. 14, 2007 letter.)

Subsequently, Bartkowski sent a letter addressing Donaghue's assertion that he
possessed medical records showing that Crawford "suffered the same lumbar disc damage from
the auto accident of August, 2000."  (Id., Ex. 50, Bartkowski Mar. 7, 2007 letter.)  Bartkowski
noted "that you say that you have medical records which help you, and you promised me that I
would immediately receive those medical records, but I do not receive those records, I see no
reason to believe you."  (Id. at 2.)  Further, "if you [Donaghue] make an assertion which are not
in fact supported by the records you are acting in bad faith. . . . If the policy limits are not offered
within twenty days we will consider our options at the conclusion whether or not to hold Allstate
responsible for the bad faith that you have demonstrated."  (Id. at 2-3.)  The next day, Donaghue
replied to Bartkowski's letter restating a willingness to provide copies of any medical records
stating, "[p]lease specify the records you desire and I will have Professional Duplicating copy
them and you may make arrangements to pick up the copies at Professional Duplicating."  (Id.,
Ex. 51, Donaghue Mar. 8, 2007 letter).

Donaghue had stated that he would not respond to Bartkowski's discovery
requests.  As a result, Bartkowski wrote to Gallagher, the neutral arbitrator, asking that he grant
Bartkowski's proposed orders compelling Donaghue to answer the Requests for Documents.
(Id., Ex. 53, Bartkowski June 12, 2007 letter to Gallagher.)  Gallagher scheduled a July 5, 2007,
conference call to resolve this discovery dispute.  (Id., Ex. 66, Bartkowski July 3, 2007 letter.)

---

17.  There is no evidence in the record suggesting that Bartkowski ever asked Donaghue to provide him with any
medical records.

On July 9, 2007, Gallagher wrote to "confirm the results of the short unpleasant conference call which the three of us shared on Thursday, July 5, 2007."  (Id., Ex. 67, Gallagher July 9, 2007 letter.)  Noting that most records "have already been exchanged between counsel," Gallagher remarked that the parties agreed that Donaghue will provide Bartkowski with "all medical records, expert opinions, statements and reports upon which Mr. Donaghue intends to rely at the time of the hearing."  (Id., see also Ex. 56, Donaghue June 22, 2007 letter.)

Looking at the record in a light most favorable to Crawford, her claim that Allstate withheld her medical records, requiring her to file a motion to obtain them lacks any basis in fact.  (Compl. ¶ 19(f),(q).)  The record suggests that Bartkowski either chose to ignore or did not understand Donaghue's repeated offer to provide any and all medical records in his possession.[18]  (See Allstate's Mot. Summ. J., Ex. 52, Bartkowski June 12, 2007 letter; Ex. 54, Donaghue June 21, 2007 letter ; Ex. 47, Donaghue Feb. 14, 2007 letter) ("However, at any time you may review any and all medical records of the claimant in my possession.")  Further, the neutral arbitrator noted that most records had "already been exchanged between counsel," and an agreement was reached about providing any outstanding documents.  There is no indication, whatsoever, that Allstate withheld records much less forced Crawford to instigate litigation to obtain them.

### b.  Donaghue's Misrepresentation of the Contents of the Medical Records in his Possession

---

18.  Bartkowski's confusion about how he was to obtain the medical records in Donaghue's possession apparently persists for in his Reply to Allstate's Motion for Summary Judgment he repeatedly remarks that "HE DID NOT SEND THE RECORDS" even though Donaghue made clear that: (a) he would provide any medical records in his possession; and (b) instructed Bartkowski how he could obtain those records.  (See Crawford's Resp. Mot. Summ. J. 17-19.)

Crawford asserts that when speaking to Bartkowski, Donaghue misrepresented "pertinent facts relating to the content of the medical records" in his possession.  (Compl. ¶ 19(a).)  She asserts that this "is the most important theory" put forth in her Complaint as Donaghue claimed that based upon "prior medical records showing prior disc damage" Allstate did not offer the policy limits.  (Crawford's Resp. Mot. Summ. J. 14; Allstate's Mot. Summ. J., Ex. 57, Bartkowski July 2, 2007 letter.)

Allstate asserts that Donaghue's concern about Crawford's prior back injuries rests upon two entries in the record: (1) an "Initial Visit Summary" written on April 3, 2006; and (2) results of cervical spine MRI ordered by John Boor, M.D. on October 3, 2005.  (Id., Ex. 44, April 3, 2006 Initial Visit Summary.)  Under "past medical history," the Initial Visit Summary noted that "[t]he patient's past medical history is significant for 4 herniated discs."  (Id.)  Allstate also notes that the Boor MRIs evidence pre-existing back problems including: "ostephytes, degeneration and spondylosis" which Donaghue believed indicated back trauma prior to September 2005.  (Allstate's Mot. Summ. J. 37.)

Donaghue clearly possessed concerns about any potential pre-existing conditions. After learning of the August 2000 head-on collision, which required considerable hospitalization, Donaghue took additional steps to learn more about Crawford's medical history.  First, after receiving Doctor Zimmerman's IME, Donaghue contacted Doctor Zimmerman asking that he examine "films from Riddle Memorial Hospital referrable to Crystal Crawford."  (Allstate's Mot. Summ. J., Ex. 42, Donaghue Feb. 5, 2007 Zimmerman letter.)  Second, given the August 2000 accident, it is reasonable to conclude that Donaghue would examine Crawford's medical records

22

in a new, more careful light.  Compounding Allstate's concern was the evidence which they

knew existed but did not possess — the complete records from Bryn Mawr Rehab Hospital.

When he deposed Donaghue, Bartkowski asked that Donaghue "produce the

record upon which he relied when he made the statement of February 14, 2007."  (Crawford's

Resp. Mot. Summ. J. 15.)  While Donaghue had previously provided all of Crawford's records to

Bartkowski, he did not, at the deposition, specify which documents he believed indicated a pre-

existing condition in Crawford.  Bartkowski "believes" Donaghue did not identify the specific

documents because no such documents "exist."  (Id.)  This Court finds it just as reasonable to

conclude that Donaghue did not specify the actual document because: (1) Bartkowski was not

letting him speak; and (2) Bartkowski did not refresh his recollection, instead expecting

Donaghue to recall a specific document from memory.  Bartkowski's belief that Donaghue did

not rely upon any document is consistent with his approach in deposing of Donaghue:

> Answer (Donaghue). No.  What I believe I've
> indicate to you in this case, and the reason for
> obtaining medical records was there were records
> which indicated that your client had, by previous
> history, herniated discs.
>
> Question (Bartkowski). Go on. Where are those medical records?
>
> A. Your clients - -
>
> Q. Where are those medical records today?
>
> A. Do you have them all with you?  I'll point one out to you.
>
> Q. Go ahead. Point one out.
>
> A. Well, where are the records?

Q. Well. You said something just now.  You said that what you were referring to was that you, at the time of the conversation, that you said that my client had medical records that show that the client has previous herniated discs. And I'm asking you, and I'm asking Allstate's lawyer, because he said that on the record, to show me where those records exist.

MR. WALTHEW: Put the records in front of him and he'll show you.

MR. BARTKOWSKI: How can I show him something that I deny exists?

THE WITNESS: Counsel, you made a statement that that doesn't exist.

MR. BARTKOWSKI: That the records don't existing.  How can I produce something that I disagree with you and say does not exist?

THE WITNESS: Counsel, can I finish my answer? In my opinion, there is a record that exists which suggests that.

MR. BARTKOWSKI: I'll ask you, Counsel for Allstate, to produce the records.

MR. Walthew; This is not a record that you don't have.  Okay?  This was a record that was produced in the case.  Mr. Donaghue reviewed it at the time. It was available to you and your client at the time. This is not some mystical record, okay?  If you want to refresh his recollection about which record it is, then you have to put the records in front of him.

(Allstate's Mot. Summ. J., Deposition of Hugh Donaghue ("Donaghue Dep.") 32:9-33:25, June

26, 2008.)  Rather than produce the record so that Donaghue could explain himself, Bartkowski

24

proceeded to conclusively determine that no records "exist" which supports Donaghue's assertion.[19]

Bartkowski notes that Crawford's comments were "[o]bviously when the plaintiff was telling the nurse she currently had four herniated discs, they are the four herniations attributed to the recent accident." (Crawford's Resp. Mot. Summ. J. 16.)  It is not clear from the Summary that the herniations referenced were caused by the "recent accident."  The "Past Medical History" section of the Initial Visit Summary references Crawford's four herniations. Similarly, the Summary's "Past Surgical History" addresses Crawford's "ankle surgery, wisdom teeth and eye surgery."  (Allstate's Mot. Summ. J.; Ex. 44, 2006 Initial Visit Summary.)  The Summary does not clearly indicate when the events listed in the past medical or surgical history occurred.  Did they all arise at the same time?  As a result of  the 2005 accident?  A reading of this Summary provides no answer to such questions.  Resultingly, the origin of these four herniations is far from "obvious" — a fact underscored by Doctor Sedacca's report.

_____

19.  It is also worth noting that after settling with Allstate, Crawford provided Allstate with a report from her treating physician, Dr. Sedacca who wrote to her counsel noting that "[t]he past medical history for this then, 23-year-old female, was significant for her prior history of the curvature of the spine as well as a motor vehicle accident occurring about five years in the past which did cause a pelvic fracture."  (Allstate's Reply Br., Ex. H, Sedacca July 10, 2007.)

The letter further examined Crawford's back pain noting that "[o]bviously, the degenerative changes do predate this trauma and are probably related to her history of the prior motor vehicle trauma.  They may also be due to the patient's history of scoliosis.  I can state this, as I have had the opportunity to review medical records from the patient's treating medical physician, which did show some  history of lower back sprains and strains, presumably based on her history of scoliosis."  (Id.)

Allstate notes that this "report was never provided to Allstate or Mr. Donaghue prior to the settlement of her UM claim."  (Allstate's Reply Br. 8.)  Crawford responds that Dr. Sedacca's report "was to be produced at the Arbitration Hearing but the policy limits were offered on July 17, 2007.  There was not going to be an Arbitration Hearing, therefore, there was no reason to turn over Dr. Sedacca's report."  (Crawford's Resp. Mot. Summ. J. 21.)  This Court will not discuss whether the report should have been turned over to Allstate.  Instead, Dr. Sedacca's report simply confirms Donaghue's interpretation of Crawford's other medical records – namely that he correctly inferred that the August 2000 automobile accident harmed her back.

Prior to the February 2007 phone call between Bartkowski and Donaghue, Allstate's actions consistently indicated that they were not only concerned about Crawford's pre-existing conditions, but also undertook reasonable steps to learn about them.  Upon reviewing Crawford's medical records, Donaghue surmised that Crawford suffered from pre-existing back pain.  The record of Crawford's own physician confirmed Donaghue's conjecture.  While Crawford repeatedly notes that Donaghue refused to provide the relevant records, it is clear that Donaghue made repeated, reasonable efforts to provide the medical records to her counsel.[20]  It is also clear that Donaghue, relying upon the entirety of the record, had reasonable concerns about Crawford's pre-existing conditions.  Assuming that Bartkowski's description of his February 2007 phone call with Donaghue is correct, this Court still fails to see how Donaghue's statement is evidence of misrepresentation of "pertinent facts relating to the content of the medical records."  (Compl. ¶ 19(a).)

### 4.)   Allstate's improper release and subsequent delay in issuing the $100,000 UM settlement check[21]

Crawford asserts that while Allstate offered her the entire $100,000 UM policy limit, that offer was issued with significant strings attached.  Specifically, "defendant provided a Release which required that the plaintiff sign and first release the defendant from 'all claims.' This would have necessarily included first party wage loss benefits and this statutory claim for

---

20.   While it is understandable that Crawford wanted to know what document(s) served as the basis for Donaghue's claim, her complaints about his failure to provide these documents rings hollow as they are her own medical records. It does not matter whether or not Bartkowski represented her after the August 2000 accident, it would have been far easier for her to obtain the records in question from her own medical care providers than from Donaghue.

21.   The Court groups Plaintiff's assertions raised in ¶¶ 16 and 17 with the following subsections from ¶ 19 of Plaintiff's Complaint into this category: (l) requiring a Release of all claims against the defendant when the defendant was offering an amount only to satisfy the policy limits of uninsured motorist claims; (p) delaying the issuance of the check for the reason that plaintiff did not agree to release the defendant as to this bad faith claim and wage loss claim; and (r) requiring plaintiff to file motion to obtain the check.  (Compl. ¶¶ 16, 17, & 19(l), (p), & (r).)

bad faith." (Compl. ¶ 16.) Crawford revised Allstate's release "releasing the defendant only for claims arising out of the Uninsured Motorist provision." (Compl. ¶ 17.) She asserts that due to her revisions, Allstate "purposely and maliciously withheld the check." (Id.) A close reading of the facts suggest that no evidence supports this claim.

On July 17, 2007, Donaghue wrote Bartkowski stating "[p]lease be advised that Allstate Insurance Company hereby tenders its $100,000 policy limits in the above captioned matter. Accordingly, I enclose a Release to be executed by the claimant." (Allstate's Mot. Summ. J.; Ex. 68, Donaghue July 17, 2007, letter.) After revising Allstate's release,[22] Bartkowski faxed the signed and revised release to Donaghue on July 26, 2007. (Id., Ex. 69, Signed and Revised Release.) Bartkowski also mailed a copy of the revised release to his client stating "[e]nclosed please find the revised Release. Allstate has not yet seen the revisions so I cannot predict if they will allow the language I have included." (Id., Ex. 70, Bartkowski July 25, 2007 letter.)

In early August, not having heard back from Donaghue — as he was on vacation, Bartkowski contacted Donaghue's office. (Id., Ex. 71, Aug. 6 call slip.) On Aug. 7, 2007, Bartkowski wrote Donaghue, complaining about Allstate's delay in issuing a settlement check.[23] (Id., Ex. 72, Bartkowski Aug. 7, 2007 letter.) He also sent Gallagher, the neutral arbitrator, a

---

22. Crawford's Response to Allstate's Motion for Summary Judgment provides an extensive analysis of the initial release provided by Allstate. (Crawford's Resp. Mot. Summ. J. 23 & 24.) This Court will not address Crawford's response nor will it address Allstate's explanation why this, the admittedly incorrect release was sent. Both arguments ignore two keys points: (1) Allstate did not object to Crawford's revised release; and (2) the erroneous sending of the wrong release gives rise, at most, to negligence not bad faith. (Allstate's Mot. Summ. J. 32 & 34.)

23. The irony of complaining about a three-week delay in issuing the settlement check, given Crawford's self-inflicted delays, is not lost on the Court.

Motion to Compel Distribution.  (Id., Ex. 73, Bartkowski Aug. 7, 2007 Gallagher letter.)

Gallagher responded to Bartkowski's letter and motion, stating that

> [h]aving reviewed the chronology of events as set
> forth in Plaintiff's Motion, and without commenting
> on the propriety of the Motion, it does not seem to
> me that Allstate is unreasonably dragging their feet
> in issuing the settlement check to Plaintiff's
> counsel.  Since Mr. Donaghue is returning to his
> office one week from today, I suggest that Mr.
> Bartkowski speak to him at that time and I feel
> confident that Mr. Donaghue can make
> arrangements with Allstate to have the settlement
> check available to Mr. Bartkowski and his client.

(Id., Ex. 74, Gallagher Aug. 7, 2007 letter.)  Upon returning from vacation, Donaghue wrote

Bartkowski stating that Allstate wanted to speak with him about the release before they issued

the check.  (Id., Ex. 75, Donaghue Aug. 13, 2007 letter.)  Donaghue noted that "[w]e also

required your tax I.D. number, which you supplied today, using your social security number."

(Id.)  Donaghue subsequently forwarded the settlement check to Bartkowski.  (Id., Ex. 76,

Donaghue Aug. 20, 2007 letter.)

        In summation, Crawford asserts that Allstate delayed in issuing its settlement

check to her because her attorney revised Allstate's release.  Yet, the record is clear that: (1)

Crawford's counsel did not check with Allstate before revising the release; (2) Allstate wanted to

check with their counsel (Donaghue) before approving the revised release; (3) Donaghue's

review of the release was delayed as he was on vacation; (4) the neutral arbitrator determined that

"[h]aving reviewed the chronology of events as set forth in Plaintiff's Motion, and without

commenting on the propriety of the Motion, it does not seem to me that Allstate is unreasonably

dragging their feet in issuing the settlement check;" (5) Allstate did not object to the revised

release (which they accepted completely); (6) Crawford received the $100,000 settlement check on August 21, 2007.  Further, Allstate did not receive Crawford's taxpayer I.D. until August 13, 2007, issuance of any check prior to that date was an impossibility.

That Allstate was not delaying payment becomes even more apparent when examining Crawford's failure to actively pursue settlement of her wage loss claim.  Bartkowski first spoke with Allstate about the procedures for wage loss coverage in November 2005.  (Id., Allstate Claim Diary 10-11.)

Twenty-two months later, on August 23, 2007, Allstate adjuster Larry Scott spoke with Bartkowski about Crawford's wage loss claim explaining that Crawford had provided no wage loss documentation to Allstate.  (Id. at 39.)  That same day, Bartkowski wrote Allstate about this wage loss claim stating that, "[i]f we cannot settle this within ten days, I will sue Allstate."  (Id., Ex. 77, Bartkowski Aug. 23 and Sept. 11, 2007 letter.)  On September 10, 2007, Bartkowski provided Allstate with the required wage loss paperwork.  (Claims Diary 40-41.) Two days later, a wage loss check was issued to Crawford on September 12, 2007.  (Id.)  This Court finds that no set of facts support Crawford's claim that Allstate: (1) either objected to her revised release; or (2) delayed in issuing any checks.

### 5.    Allstate's Use of an Unfair Doctor and Arbitrator

Crawford asserts that Allstate's use of both Doctor Bonner and arbitrator Michael Murphy was "unfair" to her.  (See Compl. ¶ 19(e),(h).)  Like the assertion that Allstate representative Chretien backdated a letter sent to Bartkowski, these claims are baseless evidencing no support in the record.

Regarding Doctor Bonner, there is no indication that he acted improperly or unfairly.  Crawford suggests that Donaghue and "other lawyers enlist Dr. Bonner repeatedly to prepare reports and to testify on behalf of their clients, whether they be plaintiff or defendant. (Crawford's Resp. Mot. Summ. J. 26.)  Further "[t]o go repeatedly to the same physician for the reason that the opinions are predictably helpful is not only bad faith, it prevents Allstate from getting a genuine impartial understanding as to the severity of the condition, or an accurate prognosis of its insureds."  (Id.)

While Bartkowski's concern about the accuracy of Allstate's information is admirable, the remainder of his assertions are conjecture.  Such circumstantial evidence fails to sustain a claim against Doctor Bonner.  A reading of the Bonner Report makes clear that he did not produce a report that was "predictably helpful" to Allstate much less in "bad faith."  Doctor Bonner concluded that:

> [b]ased upon the history given to me by the patient, the physical examination performed, and the medical documentation reviewed, it is my medical opinion, within a reasonable degree of medical certainty, that any injury that had been sustained on 9/8/05 has resolved.  The patient continues with subjective complaints, but without objective findings on physical examination.  No further treatment would be considered reasonable or necessary in relation to the incident of 9/8/05.

(Bonner Report 2.)   The Report's conclusions were appropriately cabined to the evidence before him and qualified as his own opinion.  Given the lack of evidence – and coupled with her silence about Allstate's selection of Doctor Zimmerman to conduct the other IME – it appears that

Crawford's objection to Doctor Bonner centers on his medical findings rather than on any actual evidence of bad faith.

Crawford also asserts that Allstate's selection of Michael Murphy as an arbitrator was unfair.  (Compl. ¶ 19(h).)  Crawford has provided no evidence that Murphy was an improper choice as an arbitrator.  Further, this claim is moot as the parties never utilized arbitration.[24]  Crawford has provided no factual basis for her claim that either Doctor Bonner or Michael Murphy were unfair to her claim.  More importantly, even if both men were biased against her, Crawford has failed to show that she suffered any harm.

**IV.      CONCLUSION**

For the reasons discussed above Allstate's Motion for Summary Judgment is granted in its entirety.  An appropriate order follows.

---

24.   There may be a situation whereby the prospect of a patently unfair arbitration process forces a party to settle prematurely.  This is not that case.  While the parties settled prior to arbitration, there is no way that the prospect of an unfair arbitration compelled settlement, especially as Crawford received the maximum policy limits.